FILED
CLERK, U.S DISTRICT COURT

FEB - 9 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY



DOCKETED ON CM

FEB - 9 2006

BY _____ 064

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

11 ADILAO JUAN ORTIZ,         )   NO. CV 05-5807-PA(E)
                          )

12           Petitioner,   )

13   v.                  )   REPORT AND RECOMMENDATION OF

14 JAMES A. YATES, Warden,   )   UNITED STATES MAGISTRATE JUDGE

15          Respondent.  )

16 _____)

17

18     This Report and Recommendation is submitted to the Honorable

19 Percy Anderson, United States District Judge, pursuant to 28 U.S.C.

20 section 636 and General Order 01-13 of the United States District

21 Court for the Central District of California.

22

23 **INTRODUCTION**

24

25     Petitioner suffered a Superior Court conviction for felony

26 spousal abuse after the trial judge curtailed the cross-examination

27 of the sole eyewitness to the alleged abuse.  This curtailment

28 precluded the introduction of evidence that the eyewitness was afraid

1    to deviate from her initial incriminating statements to police

2    because of threats assertedly made against her by the prosecutor.

3    The California Court of Appeal recognized the trial judge's error,

4    but deemed the error harmless after applying the wrong harmless error

5    standard.   The California Supreme Court denied Petitioner's petition

6    for review without explanation.   For the reasons discussed herein,

7    federal habeas relief must issue.

8

9                    **SUMMARY OF FEDERAL HABEAS PROCEEDINGS**

10

11       Petitioner filed a "Petition for Writ of Habeas Corpus by a

12   Person in State Custody" on August 9, 2005.   Respondent filed an

13   Answer on November 22, 2005.   Petitioner filed a Traverse on

14   December 7, 2005.

15

16                **SUMMARY OF RELEVANT PRETRIAL PROCEEDINGS**

17

18       Prior to trial, Petitioner filed a motion to disqualify the

19   Santa Barbara District Attorney's Office from prosecuting

20   Petitioner's case (Clerk's Transcript ("C.T.") 86-87).   Petitioner

21   argued that a conflict of interest existed because an employee of the

22   District Attorney's Office, Sonia Huerta, was related to the alleged

23   victim (Petitioner's wife, Miriam Ortiz) (C.T. 91-94).   Petitioner

24   asserted that the prosecuting attorney, Joshua Lynn, had instructed

25   Huerta to contact Mrs. Ortiz and tell her that if she testified in a

26   manner inconsistent with her statement to the police, Mrs. Ortiz ran

27   the risk of going to jail and losing her children (C.T. 93).

28   ///

1  In support of the motion, Petitioner submitted declarations from
2  Mrs. Ortiz and her father, Martin Huerta.  Mr. Huerta's declaration
3  stated that his sister-in-law, Sonia Huerta, asked him to convey a
4  message to Mrs. Ortiz from Lynn that, if Mrs. Ortiz did not testify
5  truthfully at the preliminary hearing, she could be sent to jail
6  (C.T. 88-89).  Mrs. Ortiz stated in her declaration that her father
7  gave her Lynn's message that if she did not testify consistently with
8  her original statement to the police, she could go to jail and lose
9  her baby, and that she needed to think about the possibility of her
10  baby growing up with both parents in prison (C.T. 90).  Mrs. Ortiz
11  stated that she "interpreted this as a threat to keep me from
12  testifying in any way favorable to my husband."  Id.

14  In opposition to the motion to disqualify, Lynn submitted a
15  declaration stating that he had spoken with Sonia Huerta concerning
16  Petitioner's case on several occasions, but that he merely told
17  Huerta that if Mrs. Ortiz were called to testify, Mrs. Ortiz would
18  need to appear and testify truthfully (C.T. 102).  The court denied
19  Petitioner's motion to disqualify the District Attorney's Office
20  (C.T. 129).  Issues regarding these alleged threats to Mrs. Ortiz
21  were to resurface during trial.

23  **SUMMARY OF TRIAL EVIDENCE**

25  I.  **Testimony of Gerardo Gonzalez**

27  Gerardo Gonzalez testified as follows:
28  ///

3

1    In February 2001, Gonzalez worked at the same company as Mrs.

2 Ortiz (Reporter's Transcript ("R.T.") 141-42).   At the time, Gonzalez

3 did not know Mrs. Ortiz was married (R.T. 141, 148).   One day at

4 work, Mrs. Ortiz asked Gonzalez to cash a $700 check for her because

5 she did not have time to go to the bank (R.T. 142-43).   Gonzalez

6 deposited Mrs. Ortiz's check into his bank account and gave Mrs.

7 Ortiz $700 in cash (R.T. 143).   A week later, Gonzalez's bank

8 informed him that the $700 check from Mrs. Ortiz had bounced (R.T.

9 143-44).   Gonzalez told Mrs. Ortiz about the problem, and Mrs. Ortiz

10 wrote him a second check (R.T. 144-45).   The second check also

11 bounced (R.T. 145).

12

13    Upset, Gonzalez called Mrs. Ortiz at her home (R.T. 146).

14 Gonzalez spoke with Mrs. Ortiz briefly (R.T. 147-48, 156).   Mrs.

15 Ortiz tried to explain about the money and began crying, at which

16 point a male voice came on the phone (R.T. 156).   Gonzalez did not

17 know the identity of the man (R.T. 150).   The man asked who Gonzalez

18 was, and Gonzalez explained to him the situation regarding the

19 bounced checks.   Id.   The man became upset, and Gonzalez thought the

20 man was accusing Gonzalez of having an affair with Mrs. Ortiz (R.T.

21 150-51).   Gonzalez explained that he just wanted to get his $700

22 back, but the man threatened to come to Gonzalez's workplace and

23 physically hurt him (R.T. 151-52).   The man sounded very angry, and

24 Gonzalez took the threat seriously (R.T. 152-53).   At that point,

25 Gonzalez hung up the phone (R.T. 152).

26 ///

27 ///

28 ///

4

**II.  Testimony of Miriam Ortiz and Curtailment of Her Cross-**
**Examination**

With considerable reluctance, and with "use immunity" (R.T. 126), Mrs. Ortiz testified as follows:

She married Petitioner in December 2000 (R.T. 161).  On February 9, 2001, she had an argument with Petitioner that began when Mrs. Ortiz's co-worker, Gerardo Gonzalez, called her at her home (R.T. 161-62).  At the time, Mrs. Ortiz was three months pregnant and feeling ill due to her pregnancy.  Id.  Mrs. Ortiz also was feeling depressed because of a prior miscarriage, and because of her grandfather's grave illness and hospitalization (R.T. 202-03).  Mrs. Ortiz had just returned home from a doctor's appointment with her husband when she received a message on her phone from Gonzalez (R.T. 162-63).  Gonzalez wanted to talk to Mrs. Ortiz regarding some money she had borrowed from him for her wedding expenses (R.T. 163).  When Mrs. Ortiz explained to Petitioner why Gonzalez was calling her, Petitioner became upset because Mrs. Ortiz had not told Petitioner that she had borrowed money from Gonzalez (R.T. 163-64).

Mrs. Ortiz returned Gonzalez's phone call and told him that she would pay the money back, but that she could not do so immediately because her grandfather was in the hospital (R.T. 164).  Mrs. Ortiz told Gonzalez that she needed to ask her parents for the money, and hung up the phone (R.T. 165).  Gonzalez called back immediately, however, and Petitioner got on the phone and asked Gonzalez to come over to discuss the situation in person.  Id.  Petitioner did not

1  express any anger on the phone or make any threats to Gonzalez (R.T.

2  165-66).   Petitioner wanted to see proof of the bounced checks

3  because Mrs. Ortiz believed that the second check had cleared (R.T.

4  199-202).

5

6      After the discussions with Gonzalez, Petitioner questioned

7  Mrs. Ortiz concerning the borrowed money (R.T. 166-67).   Petitioner

8  was upset and called Mrs. Ortiz a whore (R.T. 167-68).   This was the

9  first time Mrs. Ortiz had ever seen Petitioner upset (R.T. 169).

10  Mrs. Ortiz tried to explain the situation to Petitioner, but

11  Petitioner walked away from her (R.T. 177).   Mrs. Ortiz grabbed

12  Petitioner by the shirt and tried to get him to listen to her (R.T.

13  177-78).   At some point during the argument, Petitioner punched

14  Mrs. Ortiz in the face suddenly (R.T. 175-76, 178).   The punch did

15  not hurt her, however (R.T. 176).   Petitioner then went to the

16  restroom, and Mrs. Ortiz went to the bedroom to lie down (R.T. 178-

17  79).   She was not feeling well because of her pregnancy and her

18  grandfather's hospitalization (R.T. 178).   At some point, Petitioner

19  kicked Mrs. Ortiz in the knee, but Mrs. Ortiz did not remember

20  exactly when the kick occurred (R.T. 181-82).

21

22      On the afternoon of February 10, 2001, Mrs. Ortiz went to the

23  police station and filed a report with Officer Fuller of the Santa

24  Barbara Police Department (R.T. 170-71, 219-21).   Earlier that day,

25  Mrs. Ortiz's grandfather had passed away.   Id.   Mrs. Ortiz went to

26  the police station with her mother, father, and sister (R.T. 171).

27  ///

28  ///

1   At the police station, Mrs. Ortiz told Officer Fuller about the

2   phone call from Gonzalez and the fact that Petitioner had gotten

3   upset, called Mrs. Ortiz a whore, and asked her what she was doing in

4   exchange for the money (R.T. 172-73).   Mrs. Ortiz recalled telling

5   Officer Fuller that Petitioner had punched her and kicked her in the

6   knee (R.T. 178, 182).   Mrs. Ortiz got a restraining order against

7   Petitioner, although she did not recall personally asking for one

8   (R.T. 192).   Mrs. Ortiz testified Petitioner has never made any

9   threats to Mrs. Ortiz or to her family (R.T. 193).   Mrs. Ortiz did

10  not feel like herself when she was at the police station (R.T. 221-

11  22).   She felt she was "kind of spacing out" as she was talking to

12  Officer Fuller, and mentioned this to him (R.T. 221).

13

14  Mrs. Ortiz recalled that photographs were taken of her at the

15  police station when she filed her report on February 10, 2001 (R.T.

16  183).   When the prosecutor showed Mrs. Ortiz copies of the

17  photographs, Mrs. Ortiz identified a large bruise on the right side

18  of her chin shown in the photographs as having been caused by

19  Petitioner's punch (R.T. 183-84).   The photographs also showed some

20  damage to Mrs. Ortiz's lips caused by Petitioner's punch, although

21  some of the chapping of her lip and the redness on the inside of her

22  lip reportedly existed prior to Petitioner's punch (R.T. 184-85).

23  When shown photographs of her right knee taken on February 10,

24  Mrs. Ortiz said she could not tell whether the bruise shown in

25  the photographs was caused by Petitioner's kick (R.T. 185-86).

26  The bruise was on the same leg that Petitioner kicked, however

27  (R.T. 186).   In one photograph of Mrs. Ortiz's left eye taken on

28  February 10, an area around her left eye appeared darkened, but

7

1  Mrs. Ortiz did not recall Petitioner hitting her there (R.T. 186-87).

2  Mrs. Ortiz said she suspected the darkened area was a result of her

3  crying or not getting any sleep (R.T. 187).  Mrs. Ortiz did not

4  recall whether she felt any physical pain on February 10, although

5  she recalled telling Officer Fuller that her leg and mouth still hurt

6  severely (R.T. 188).

7

8      Approximately three weeks prior to trial, Mrs. Ortiz spoke with

9  Jim Nalls, an investigator for the District Attorney's Office (R.T.

10  194-95).  Mrs. Ortiz did not want to talk to Nalls about the case,

11  and did not want to testify in court (R.T. 195-96).  Mrs. Ortiz

12  claimed she could not recall telling Nalls she "had hit a rocking

13  chair or something along those lines" (R.T. 195).  Mrs. Ortiz told

14  Nalls that she just wanted to live a normal life with Petitioner and

15  their daughter (R.T. 196).

16

17      During the cross-examination of Mrs. Ortiz, Petitioner's

18  counsel, Tom Stanley, attempted to elicit testimony regarding the

19  alleged threats by the prosecutor.  The following exchange occurred

20  before the jury:

21

22          Q  And even though you didn't really want to speak

23      with [Jim Nalls], you did speak with him for a while?

24          A  Yes, I did mention to him we were going to go out .

25      . . and he continued to question me, and I mention [sic] to

26      him that I didn't want to talk about it [the February 9,

27      2001 incident].

28          Q  Did you have some concerns in talking about it?

8

1    Had you perceived any sort of danger to your situation?

2        A   Yes.   They've actually - they've threatened me that

3    if I didn't testify -

4        MR. LYNN: Objection.  Move to strike.  Counsel -

5        MR. STANLEY: Goes to her state of mind, your Honor.

6    I think it's entitled to be presented.

7        THE COURT: Sustained.

8        . . .

9        THE COURT: The question is what did she say to

10   Mr. Nalls.  I'll permit it.  What did you say to him?

11       THE WITNESS: What did I say to him the day that he

12   went to the house?

13       Q   BY MR. STANLEY: About why you didn't want to talk

14   to him.

15       A   Because they had threatened me that if I didn't -

16       MR. LYNN: Same objection.

17       THE COURT: I'm going to sustain the objection if

18   that's the issue.

19

20   (R.T. 204-05).

21

22       Stanley then asked for a sidebar conference (R.T. 205).  At

23   sidebar, Stanley asserted that Mrs. Ortiz told Nalls that the

24   prosecutor had threatened her with the loss of her child.  Id.

25   Stanley further asserted that, earlier in the day, Mrs. Ortiz had

26   told Stanley that she was concerned she would be prosecuted for

27   perjury if she told "the truth," which Mrs. Ortiz represented to be

28   that Petitioner did not hit her in the mouth.  Id.  Stanley argued

that evidence of the threat was relevant to the credibility of Mrs.

Ortiz's testimony (R.T. 205-06).

The trial court excused the jury and met with Stanley, Lynn, and

Mrs. Ortiz's counsel, Dan Murphy, in chambers (R.T. 207).[1]  In

chambers, Mr. Stanley repeated his claim that, earlier in the day,

Mrs. Ortiz had told him Petitioner never hit her, but that she was

concerned she would be prosecuted for perjury if her testimony varied

from her original statement to the police (R.T. 208).  Stanley stated

that the story Mrs. Ortiz·told Nalls regarding the February 9

incident was that she sustained her injuries when she fell into a

rocking chair.  (Id.; see also C.T. 45 (Lynn represented to the court

before trial that Mrs. Ortiz "made it clear what she intended to do

was take the stand and say something other than what she told

police"); C.T. 185 (prosecution's trial brief stated: "It is

anticipated that the victim in the case will recant in her testimony

the factual back-ground [sic] behind her injuries. . . .  She will

undoubtedly testify under oath that what she told Officer Fuller and

her family was a lie or otherwise incorrect.") (original emphasis);

R.T. 302 (Stanley represented to the court after trial that Mrs.

Ortiz told the District Attorney's investigator in a tape recorded

statement taken before trial that Mrs. Ortiz had received her

injuries by falling)).

Murphy, who was present during the conversation earlier in the

day between Stanley and Mrs. Ortiz, recalled Mrs. Ortiz's statements

---

[1]      Mrs. Ortiz had retained Mr. Murphy to represent her the
day before trial (R.T. 125-26).

1 differently.  Murphy said that he never heard Mrs. Ortiz deny that

2 Petitioner hit her, but did hear her ask "How is anyone going to know

3 what really happened, what's really the truth, when no one was there?

4 It was just me and him" (R.T. 211).

5

6        Stanley requested the opportunity to make an offer of proof by

7 questioning Mrs. Ortiz outside the presence of the jury (R.T. 214-

8 16).  The trial court denied Stanley's request, and refused to allow

9 any cross-examination of Mrs. Ortiz regarding the alleged threats by

10 the prosecutor (R.T. 216-19).

11

12 **III. <u>Testimony of James Fuller</u>**

13

14        Officer James Fuller testified as follows:

15

16        On February 10, 2001, Officer Fuller interviewed Mrs. Ortiz at

17 the police station but did not tape record the interview (R.T. 227-

18 28, 237).  Officer Fuller noticed discoloration and severe bruising

19 to Mrs. Ortiz's mouth area and left eye, as well as discoloration and

20 bruising on the inside of her right knee (R.T. 228-29).  During the

21 interview, another officer took photographs of Mrs. Ortiz's injuries

22 (R.T. 229).  Mrs. Ortiz told Officer Fuller that she had an argument

23 with Petitioner after she received a phone call from a male caller

24 (R.T. 234).  Petitioner accused Mrs. Ortiz of sleeping with the male

25 caller and stated that she was a whore.  <u>Id.</u>  Mrs. Ortiz reported

26 that, during the argument, Petitioner punched her in the mouth,

27 causing damage to her inner lip (R.T. 232).  Mrs. Ortiz also stated

28 that she received the bruise to her left eye during a struggle with

11

Petitioner as she was trying to get away from him (R.T. 230).  Mrs.
Ortiz stated she was lying on her bed in her bedroom when she
received the bruise to her right knee (R.T. 230-31).  Throughout the
interview, Mrs. Ortiz complained of severe pain in the inside of her
right knee, her chin, and the inside of her mouth (R.T. 242).  Mrs.
Ortiz insisted that she wanted a restraining order against Petitioner
for her and her family (R.T. 232-33).  Mrs. Ortiz said that she
needed the restraining order because Petitioner threatened to hurt
her family if she ever left him (R.T. 233).

**IV.   Other Evidence**

     The trial court read to the jury a stipulation by the parties
that, "within four to ten years immediately prior to the crime
alleged in this case [Petitioner] was convicted of felony spousal
abuse" (R.T. 138).

**V.   Defense**

     Petitioner did not testify.  In closing argument, Petitioner's
counsel conceded Petitioner had assaulted Mrs. Ortiz, but argued that
the jury should find Petitioner guilty of only misdemeanor spousal
battery (R.T. 278).

SUMMARY OF POST-TRIAL RULINGS

     After the jury found Petitioner guilty of felony spousal abuse,
Petitioner filed a motion for a new trial based on the trial court's

refusal to allow cross-examination of Mrs. Ortiz regarding the

alleged threats by the prosecutor (C.T. 347-53).  The trial court

denied the motion for new trial (C.T. 378-79).

The Court of Appeal concluded that the trial court erred in

refusing to allow cross-examination of Mrs. Ortiz regarding whether

she felt threatened by the prosecutor (Answer, Ex. D at 101).  The

Court of Appeal reasoned that such cross-examination bore directly on

Mrs. Ortiz's credibility as a witness.  Id.  The Court of Appeal

ruled, however, that the error was harmless "because it is not

reasonably probable that appellant would have achieved a more

favorable outcome in the absence of this error" (Answer, Ex. D at

101).  The California Supreme Court denied Petitioner's petition for

review without explanation (Answer, Ex. F).

## SUMMARY OF PETITIONER'S CLAIM

Petitioner claims that the trial court's curtailment of the

cross-examination of Mrs. Ortiz prejudicially denied Petitioner his

constitutional right to confrontation.

## STANDARD OF REVIEW

A federal court may not grant an application for writ of habeas

corpus on behalf of a person in state custody with respect to any

claim that was adjudicated on the merits in state court proceedings

unless the adjudication of the claim: (1) "resulted in a decision

that was contrary to, or involved an unreasonable application of,

1   clearly established Federal law, as determined by the Supreme Court

2   of the United States"; or (2) "resulted in a decision that was based

3   on an unreasonable determination of the facts in light of the

4   evidence presented in the State court proceeding."   28 U.S.C. §

5   2254(d) (as amended); Woodford v. Visciotti, 537 U.S. 19, 24-26

6   (2002); Early v. Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor,

7   529 U.S. 362, 405-09 (2000).

8

9       "Clearly established Federal law" refers to the governing legal

10  principle or principles set forth by the Supreme Court at the time

11  the state court renders its decision.   Lockyer v. Andrade, 538 U.S.

12  63 (2003).   A state court's decision is "contrary to" clearly

13  established Federal law if: (1) it applies a rule that contradicts

14  governing Supreme Court law; or (2) it "confronts a set of facts . .

15  . materially indistinguishable" from a decision of the Supreme Court

16  but reaches a different result.   See Early v. Packer, 537 U.S. at 8

17  (citation omitted); Williams v. Taylor, 529 U.S. at 405-06.

18

19      Under the "unreasonable application prong" of section

20  2254(d)(1), a federal court may grant habeas relief "based on the

21  application of a governing legal principle to a set of facts

22  different from those of the case in which the principle was

23  announced."   Lockyer v. Andrade, 538 U.S. at 76 (citation omitted);

24  see also Woodford v. Visciotti, 537 U.S. at 24-26 (state court

25  decision "involves an unreasonable application" of clearly

26  established federal law if it identifies the correct governing

27  Supreme Court law but unreasonably applies the law to the facts).

28  A state court's decision "involves an unreasonable application of

14

1 [Supreme Court] precedent if the state court either unreasonably

2 extends a legal principle from [Supreme Court] precedent to a new

3 context where it should not apply, or unreasonably refuses to extend

4 that principle to a new context where it should apply." <u>Williams v.</u>

5 <u>Taylor</u>, 529 U.S. at 407 (citation omitted).

6

7     "In order for a federal court to find a state court's

8 application of [Supreme Court] precedent 'unreasonable,' the state

9 court's decision must have been more than incorrect or erroneous."

10 <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003) (citation omitted).

11 "The state court's application must have been 'objectively

12 unreasonable.'" <u>Id.</u> (citation omitted); <u>see also</u> <u>Clark v. Murphy</u>,

13 331 F.3d 1062, 1068 (9th Cir.), <u>cert. denied</u>, 540 U.S. 968 (2003).

14 In applying these standards, this Court looks to the last reasoned

15 state court decision, which is the opinion of the Court of Appeal.

16 <u>See</u> <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002).

17

18                          **DISCUSSION**

19

20 **I.**    **The Trial Court's Refusal to Allow Cross-Examination Concerning**

21       **Alleged Threats by the Prosecutor Against Mrs. Ortiz Violated**

22       **the Confrontation Clause.**

23

24     The Confrontation Clause ensures the reliability of the

25 testimony presented against a criminal defendant. <u>Maryland v. Craig</u>,

26 497 U.S. 836, 845 (1990). A primary interest secured by the

27 Confrontation Clause is the right to cross-examine witnesses.

28 <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678 (1986). Violations of the

1  Confrontation Clause are subject to harmless error analysis.  Olden
2  v. Kentucky, 488 U.S. 227, 232 (1988) (per curiam); Van Arsdall, 475
3  U.S. at 684; Christian v. Rhode, 41 F.3d 461, 468 (9th Cir. 1994).

4

5      Trial judges "retain wide latitude to limit reasonably a
6  criminal defendant's right to cross-examine a witness based on
7  concerns about, among other things, harassment, prejudice, confusion
8  of the issues, the witness' safety, or interrogation that is
9  repetitive or only marginally relevant."  Michigan v. Lucas, 500 U.S.
10 145, 149 (1991) (citation and internal quotations omitted); Van
11 Arsdall, 475 U.S. at 679; People v. Frye, 18 Cal. 4th 894, 946, 77
12 Cal. Rptr. 2d 25, 49, 959 P.2d 183 (1998), cert. denied, 526 U.S.
13 1023 (1999).  Nevertheless, a Confrontation Clause violation occurs
14 when the defendant is "prohibited from engaging in otherwise
15 appropriate cross-examination designed to show a prototypical form of
16 bias on the part of the witness, and thereby to expose to the jury
17 the facts from which jurors could appropriately draw inferences
18 relating to the reliability of the witness."  Van Arsdall, 475 U.S.
19 at 680 (citation and internal quotations omitted).

20

21     This Court concurs with the Court of Appeal's determination
22 that the trial court erred by prohibiting the cross-examination of
23 Mrs. Ortiz regarding the alleged threats by the prosecutor.  The
24 trial court improperly prevented Petitioner from pursuing a line of
25 cross-examination that would have tended to show "a prototypical form
26 of bias on the part of the witness."  See Van Arsdall, 475 U.S. at

27

28

680.[2]  Notably, the trial court failed to identify any conceivable

justification (such as harassment, prejudice, confusion of the

issues, the witness' safety, or cumulativeness) for prohibiting the

cross-examination of Mrs. Ortiz regarding the alleged threats (see

R.T. 204, 217-19).  The trial court's refusal to allow Petitioner to

develop a theory of bias through cross-examination plainly violated

the Confrontation Clause.  See Davis v. Alaska, 415 U.S. 308, 317-18

(1974) (Confrontation Clause violation where defendant prohibited

from cross-examining a witness regarding the witness' probationary

status for a juvenile burglary conviction; such evidence was relevant

to support the defense's theory that the witness' motive to testify

was to avoid revocation of his probation, or to direct suspicion away

from himself); Van Arsdall, 475 U.S. at 679 (Confrontation Clause

violation where defendant prohibited from cross-examining a witness

regarding his promise to cooperate with the prosecution in exchange

for a dismissal of a public intoxication charge against him); United

States v. Schoneberg, 396 F.3d 1036, 1040-42 (9th Cir. 2005)

(Confrontation Clause violation where defendant prohibited from

cross-examining a witness regarding the government's promise to seek

a reduction of the witness' prison sentence in exchange for the

_____

> [2]     Respondent apparently asserts that the communication
> from the District Attorney's Office to Mrs. Ortiz was not an
> actual threat.  Whether the communication constituted an actual
> threat is largely beside the point.  It was Mrs. Ortiz's
> perception of the communication that was relevant to her
> motivation for testifying against Petitioner.  See, e.g.,
> Wilkerson v. Cain, 233 F.3d 886, 890-91 (5th Cir. 2000) (witness'
> subjective belief that he had a deal with the prosecution would
> be relevant to the witness' credibility, even if no such deal
> actually existed).  This Court need not and does not determine
> precisely what Lynn communicated to Sonia Huerta, what Sonia
> Huerta communicated to Martin Huerta, or what Martin Huerta
> communicated to Mrs. Ortiz.

1 │ witness' testimony); see also Lopez v. Burke, 413 F.2d 992, 994 (7th

2 │ Cir. 1969) (evidence that a witness was induced to testify against

3 │ the defendant under the threat of prosecution if he refused to

4 │ testify, and the expectation of immunity if he did, "may raise grave

5 │ questions about the reliability and credibility of the witness'

6 │ testimony").

7 │

8 │ **II.   This Court is Unable to Find that the Confrontation Clause**

9 │ **Violation Was Harmless.**

10 │

11 │ **A.   The Court of Appeal's Harmless Error Review Was**

12 │ **"Objectively Unreasonable."**

13 │

14 │ Although the Court of Appeal found that the trial court erred by

15 │ refusing to allow cross-examination of Mrs. Ortiz regarding the

16 │ alleged threats by the prosecutor, the Court of Appeal also found the

17 │ error was harmless (Answer, Ex. D at 101).  Under the AEDPA, the

18 │ federal habeas court must defer to a state court's finding of

19 │ harmlessness unless the finding is contrary to Supreme Court

20 │ precedent, or the state court applied the harmless error review in an

21 │ "objectively unreasonable" manner.  Inthavong v. LaMarque, 420 F.3d

22 │ 1055, 1058-59 (9th Cir. 2005) (citing Mitchell v. Esparza, 540 U.S.

23 │ 12, 17-18 (2003)).  If the state court's harmless error finding is

24 │ contrary to Supreme Court precedent or objectively unreasonable, then

25 │ no deference is owed and the federal habeas court must conduct an

26 │ independent harmless error analysis under Brecht v. Abrahamson, 507

27 │ U.S. 619 (1993).  Inthavong, 420 F.3d at 1059.

28 │ ///

1   The Court of Appeal stated that the trial court's error in

2   curtailing the cross-examination of Mrs. Ortiz was harmless "because

3   it is not reasonably probable that appellant would have achieved a

4   more favorable outcome in the absence of this error," citing People

5   v. Cudjo, 6 Cal. 4th 585, 611-12 (1993) and People v. Watson, 46 Cal.

6   2d 818, 836 (1956) (Answer, Ex. D at 101).   The Court of Appeal

7   thereby applied the wrong harmless error standard.   As the Court of

8   Appeal acknowledged, Petitioner alleged that the curtailment of

9   cross-examination violated Petitioner's due process and Sixth

10  Amendment rights (Answer, Ex. D at 95).   On direct review, claims of

11  constitutional error are subject to the harmless error standard set

12  forth in Chapman v. California, 386 U.S. 18 (1967).   See People v.

13  Lawson, 131 Cal. App. 4th 1242, 1249 n.7, 32 Cal. Rptr. 3d 634, 640

14  (2005) (constitutional errors ordinarily are subject to the Chapman

15  harmless error test); In re Angela C., 99 Cal. App. 4th 389, 394, 120

16  Cal. Rptr. 2d 922, 925-26 (2002) (same).   Under Chapman, the standard

17  for harmlessness is "harmless beyond a reasonable doubt," a more

18  exacting standard than the standard applied by the Court of Appeal in

19  the present case.   See Chapman, 386 U.S. at 24.   Because the Court of

20  Appeal failed to apply the proper harmless error standard, the Court

21  of Appeal necessarily conducted its harmless error review in an

22  "objectively unreasonable" manner.   Consequently, this Court gives no

23  deference to the Court of Appeal's harmlessness finding, and instead

24  conducts an independent harmless error analysis under Brecht.   See

25  Inthavong, 420 F.3d at 1059.

26  ///

27  ///

28  ///

**B.** **This Court is in "Grave Doubt" as to the Harmfulness or Harmlessness of the Confrontation Clause Violation.**

To assess the impact of a Confrontation Clause violation, the Court considers whether, "assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless . . . ." Van Arsdall, 475 U.S. at 684.  To reflect the fully realized "damaging potential of the cross-examination," the Court should examine the record on the assumption that the jury might have discarded all portions of the subject witness' testimony that the prohibited cross-examination potentially would have affected.  See United States v. Stock, 948 F.2d 1299, 1303 (D.C. Cir. 1991); see also United States v. Freeman, 164 F.3d 243, 250 (5th Cir. 1999), cert. denied, 526 U.S. 1105 (1999); United States v. Lankford, 955 F.2d 1545, 1552 (11th Cir. 1992); but see Graham v. Wilson, 828 F.2d 656, 660 (10th Cir. 1987), cert. denied, 484 U.S. 1069 (1988) (under the Van Arsdall analysis, "the question is not whether the verdict might have been different without any of [the witness'] testimony, but whether the verdict might have been different if [the witness'] testimony were further impeached . . .").  Under Brecht, a constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict."  See Fowler v. Sacramento County Sheriff's Department, 421 F.3d 1027, 1041-42 (9th Cir. 2005).  The harmless error analysis for a Confrontation Clause violation requires the court to consider: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or

20

contradicting the witness' testimony on material points; (4) the
extent of cross-examination otherwise permitted; and (5) the overall
strength of the prosecution's case.   See Van Arsdall, 475 U.S. at
684; Fowler, 421 F.3d at 1041-42 (applying Van Arsdall factors under
a Brecht harmless error standard on habeas review); Welchel v.
Washington, 232 F.3d 1197, 1206 (9th Cir. 2000) (same).

     As an initial matter, the Court rejects Respondent's argument
that any error by the trial court in curtailing the cross-examination
of Mrs. Ortiz was harmless because Petitioner's counsel eventually
conceded in closing argument that Petitioner assaulted Mrs. Ortiz.
The record reflects that Petitioner's counsel made the strategic
decision to concede an assault and argue for a misdemeanor conviction
only after the trial court committed the confrontation error (see
R.T. 205, 226, 304-05).   This strategic decision (which counsel
believed the confrontation error virtually compelled[3]) did not negate
the potential harmfulness of the error.   See Fahy v. Connecticut, 375
U.S. 85, 91 (1963) (noting cumulative prejudicial effect of the trial
court's admission of improperly seized evidence, where the admission
of that evidence induced the defendants to take the stand and admit
their guilt).

_____

     [3]     Counsel believed that any attempt to exploit Mrs.
Ortiz's alleged out-of-court recantation, in the absence of
evidence to attempt to explain why Mrs. Ortiz nevertheless still
testified in court that Petitioner assaulted her, would have been
disadvantageous to Petitioner (R.T. 302-05).   Counsel feared
that, absent the excluded evidence, the jury would view the
subsequently disavowed recantation as the contrived product of
Petitioner's alleged threats toward Mrs. Ortiz and her family.
Id.

21

1  Turning to the first factor listed in <u>Van Arsdall</u>, Mrs. Ortiz's
2  testimony undoubtedly was critical to the prosecution's case.   Mrs.
3  Ortiz was the only person, aside from Petitioner, who actually
4  witnessed the February 9, 2001 incident at the Ortiz residence.  No
5  evidence other than Mrs. Ortiz's statements and testimony directly
6  linked Petitioner to the injuries suffered by Mrs. Ortiz.  Thus, the
7  first factor weighs heavily in favor of harmfulness.  <u>See, e.g.</u>,
8  <u>Fowler</u>, 421 F.3d at 1042 (molestation victim's testimony central to
9  prosecution's case in the absence of any physical evidence of, or any
10  third party witness to, the alleged molestation); <u>Cotto v. Herbert</u>,
11  331 F.3d 217, 254 (2nd Cir. 2003) (first <u>Van Arsdall</u> factor weighed
12  in favor of defendant, where witness whose cross-examination was
13  improperly restricted was the only person to identify the defendant
14  as the perpetrator of the crime).

15

16  With respect to the second <u>Van Arsdall</u> factor, Mrs. Ortiz's
17  testimony was not cumulative.  As discussed, Mrs. Ortiz provided the
18  only eyewitness account of what occurred at the Ortiz residence on
19  February 9.  Thus, the second factor also weighs heavily in favor of
20  harmfulness.  <u>See</u> <u>Fowler</u>, 421 F.3d at 1042; <u>Cotto</u>, 331 F.3d at 254.

21

22  With respect to the third <u>Van Arsdall</u> factor, there was evidence
23  corroborating Mrs. Ortiz's testimony on some material points.
24  Gonzalez's testimony was consistent with Mrs. Ortiz's testimony that
25  she and Petitioner argued on February 9 after Gonzalez called the
26  Ortiz residence to inquire into the $700 bounced check.   The
27  photographs taken of Mrs. Ortiz's injuries on February 10 were
28  consistent with Mrs. Ortiz's testimony that Petitioner physically

1    assaulted her.  Similarly, Officer Fuller's testimony regarding what

2    Mrs. Ortiz reported to him was largely consistent with Mrs. Ortiz's

3    testimony that Petitioner physically assaulted her, notwithstanding

4    Mrs. Ortiz's trial attempts to minimize the severity of her injuries.

5    Thus, the third factor tends to weigh against harmfulness.

6

7        With respect to the fourth <u>Van Arsdall</u> factor, although the

8    trial court allowed Petitioner's counsel to cross-examine Mrs. Ortiz

9    regarding other matters, the court prohibited any cross-examination

10   regarding communications from the District Attorney's Office that may

11   have influenced Mrs. Ortiz's testimony at trial.  The court thereby

12   prevented Petitioner from presenting any evidence to support the

13   desired argument that Mrs. Ortiz was testifying against Petitioner

14   only to avoid prosecution herself.  Petitioner was allowed to present

15   evidence from which to argue that Mrs. Ortiz was depressed and under

16   severe emotional stress at the time of the incident, thereby calling

17   into question the reliability of her recollection of the incident.

18   This species of impeachment evidence, however, could not substitute

19   for the excluded testimony regarding the alleged threats by the

20   prosecutor.  See <u>Fowler</u>, 421 F.3d at 1043 (evidence presented

21   regarding molestation victim's prior criminal activity was

22   qualitatively different from, and could not substitute for, excluded

23   evidence of the victim's unfounded allegations of molestation in two

24   prior incidents).  The fourth factor therefore weighs in favor of

25   harmfulness.

26

27       The Court also observes that the exclusion of evidence regarding

28   the alleged threats by the prosecutor had a prejudicial effect on

23

1  Petitioner beyond the mere deprivation of an opportunity to impeach.
2  Mrs. Ortiz's testimony at trial clearly revealed her reluctance to
3  testify that Petitioner abused her.  Mrs. Ortiz expressly stated that
4  she did not want to be in court and just wanted to live a normal life
5  with her husband and daughter (R.T. 196).  Although she testified
6  that Petitioner abused her, Mrs. Ortiz tried to minimize the extent
7  of her injuries (R.T. 175-76, 181-82, 185-86).  Mrs. Ortiz also
8  attempted to raise doubts concerning the reliability of her report to
9  the police by suggesting she was emotionally unstable and not fully
10  aware at the time (R.T. 221-22).  She even denied Officer Fuller's
11  claim that she had asked for a restraining order against Petitioner
12  because of Petitioner's alleged threats toward her and her family
13  (R.T. 192-93).

14

15      The Court of Appeal referenced evidence of Mrs. Ortiz's
16  reluctance to cooperate with the prosecution as supporting the
17  conclusion Petitioner received a fair trial (Answer, Ex. D at 102).
18  Absent an alternative explanation for Mrs. Ortiz's transparent
19  reluctance to testify, however, evidence of this reluctance tended to
20  bolster her credibility unfairly, to Petitioner's consequent
21  detriment.  Without knowing anything of the alleged threats by the
22  prosecutor, the jury probably concluded that Mrs. Ortiz's reluctance
23  to testify regarding abuse must have stemmed from her desire to help
24  Petitioner, because of either: (1) Mrs. Ortiz's continuing affection
25  for Petitioner; or (2) Mrs. Ortiz's continuing fear of Petitioner
26  (especially given evidence Petitioner had threatened her and her
27  family).  There were no other explanations the jury could have
28  inferred from the evidence allowed to be presented.  The excluded

1 evidence of the alleged threats by the prosecutor, however, could
2 have provided an alternative explanation for Mrs. Ortiz's reluctance
3 to testify regarding abuse.  This evidence could have permitted
4 inferences that the alleged abuse never occurred, that in good
5 conscience Mrs. Ortiz did not want to repeat her prior false
6 accusation of abuse, but that she now could not withdraw the
7 accusation for fear she would be prosecuted if she did so.  Depriving
8 the defense of this alternative explanation tended to insure that the
9 jury would believe Mrs. Ortiz to be motivated by a desire to help
10 Petitioner, a motivation that rendered her reluctant testimony of
11 abuse utterly convincing.  See Fowler, 421 F.3d at 1043 ("Absent the
12 proffered cross-examination, the jury was left without a possible
13 explanation for why [the victim's] account differed so [from the
14 defendant's testimony].  The proffered cross-examination, however,
15 would have provided a jury with a theory" to explain why the victim's
16 account was not reliable).

17

18     Finally, with respect to the fifth Van Arsdall factor, the
19 overall strength of the prosecution's case was highly dependent on
20 Mrs. Ortiz's testimony.  As discussed, Mrs. Ortiz provided the sole
21 direct evidence that Petitioner was the cause of the injuries
22 suffered by Mrs. Ortiz.  If cross-examination had discredited Mrs.
23 Ortiz's testimony in this regard, the jury likely would have devalued
24 Officer Fuller's testimony, the persuasiveness of which depended on
25 Mrs. Ortiz's credibility.  Thus, if the damaging potential of the
26 erroneously excluded impeachment evidence had been fully realized,
27 the jury would have been left to consider only the evidence not
28 dependent for its probity on the credibility of Mrs. Ortiz: (1) the

1  photographs showing the extent, but not the cause, of Mrs. Ortiz's

2  injuries; (2) Gonzalez's testimony that on the day of the incident an

3  unidentified male at Mrs. Ortiz's residence (presumably Petitioner)

4  was upset and threatened Gonzalez; and (3) Petitioner's prior

5  conviction for felony spousal abuse.  Although this evidence is not

6  insubstantial, the evidence is less than overwhelming.

7

8       After weighing all of the Van Arsdall factors, and after

9  reviewing the entire record, the Court is left in grave doubt as to

10 the harmfulness or harmlessness of the trial court's erroneous

11 curtailment of Mrs. Ortiz's cross-examination.  Given, in particular,

12 the importance of Mrs. Ortiz's testimony in linking Petitioner to

13 Mrs. Ortiz's injuries, the Court is unable to conclude without grave

14 doubt that the error had no "substantial and injurious effect or

15 influence" on the jury's verdict.  Cf. Kittelson v. Dretke, 426 F.3d

16 306, 322-23 (5th Cir. 2005) ("In a case that turned entirely on the

17 credibility of the complaining witness, the state courts' restriction

18 on [the petitioner's] ability to challenge that credibility violated

19 his clearly-established confrontation and due process rights and

20 cannot be considered harmless."); Wilkerson v. Cain, 233 F.3d 886,

21 892 (5th Cir. 2000) (where there was no evidence connecting the

22 petitioner to a prison murder other than the supposed eyewitness

23 testimony of a fellow inmate, the trial court's refusal to allow

24 cross-examination of the inmate regarding the inmate's desire to

25 obtain a transfer in exchange for his testimony was not harmless);

26 Brinson v. Walker, 2006 WL 27691 *21-22 (W.D.N.Y. Jan. 5, 2006)

27 (preclusion of cross-examination into the bias of "the only witness

28 to the alleged crime available to the prosecution" found not harmless

1  under <u>Brecht</u>).  When a federal court, applying the <u>Brecht</u> standard in

2  a habeas proceeding, "is in grave doubt as to the harmlessness of an

3  error," habeas relief must be granted.  <u>California v. Roy</u>, 519 U.S.

4  2, 5 (1996) (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 437 (1995));

5  <u>see also</u> <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 950 (9th Cir. 2002) ("the

6  inquiry cannot be merely whether there was enough to support the

7  result, apart from the phase affected by the error.  It is rather,

8  even so, whether the error itself had substantial influence.  If so,

9  or if one is left in grave doubt, the conviction cannot stand.")

10  (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 765 (1946)).

11  Accordingly, habeas relief must issue.

13  **RECOMMENDATION**

15  For all of the foregoing reasons, IT IS RECOMMENDED that the

16  Court issue an Order: (1) approving and adopting this Report and

17  Recommendation; and (2) directing that Judgment be entered granting a

18  conditional writ of habeas corpus.

20  DATED:  February 8, 2006.

23  CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.   No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.