1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

11   ADILAO JUAN ORTIZ,                    No. CV 05-5807 PA (E)

12            Petitioner,                  ORDER DENYING PETITION FOR WRIT
                                           OF HABEAS CORPUS BY A PERSON IN
13       v.                                STATE CUSTODY

14   JAMES A. YATES,

              Respondent.
15

16

17

18       The Court has before it petitioner Adilao Juan Ortiz's ("Petitioner") Petition for Writ

19   of Habeas Corpus by a Person in State Custody, filed August 9, 2005. Respondent filed an

20   Answer on November 22, 2005, and Petitioner filed a Traverse on December 7, 2005. The

21   Magistrate Judge assigned to this action filed a Report and Recommendation on February 9,

22   2006. The Magistrate's Report recommends that the writ of habeas corpus be conditionally

23   granted, and that Petitioner be released or retried within ninety days. After carefully

24   reviewing the record in this action, the Court declines to adopt the Magistrate's

25   recommendation.

26       In his Petition, Petitioner alleges that he is being unlawfully detained because he was

27   denied his Sixth Amendment right to cross-examine the prosecution's witness, Miriam Ortiz.

28

1  I.     Factual Background

2       In 2002, Petitioner was tried before a jury and convicted of willful infliction of

3  corporal injury to his spouse in violation of California Penal Code § 273.5.  He admitted that

4  he had suffered four prior serious and violent felony convictions for the purposes of the

5  California Three Strikes law and served one prior prison term.  See Cal. Pen. Code §§ 667,

6  667.5, 1170.12.[1/]  Based thereon, the trial court sentenced him to twenty-six years to life in

7  state prison.

8       A.     Trial Testimony

9       During the trial, Gerardo Gonzalez ("Mr. Gonzalez") testified that he worked with

10  Petitioner's wife, Miriam Ortiz ("Mrs. Ortiz"), in February of 2001.  At the time, Mr.

11  Gonazalez was unaware that Mrs. Ortiz was married.  Sometime during that month, Mrs.

12  Ortiz ask him if he would cash a $700.00 check for her because she did not have time to go

13  to the bank.  Mr. Gonzalez agreed and deposited Mrs. Ortiz's check into his own personal

14  bank account and gave her $700.00 in cash.  Approximately one week later, Mr. Gonzalez's

15  bank informed him that the check was returned for insufficient funds.  Mr. Gonzalez

16  informed Mrs. Ortiz of the problem and she issued him a second check to satisfy the debt.

17  The second check was also returned for insufficient funds.

18       Mr. Gonzalez attempted to communicate with Mrs. Ortiz at work to get an

1   was calling. He told the man that he worked with Mrs. Ortiz and stated, "I'm sorry that I

2   called you guys, but I'm very upset because, you know, I lost this $700.00 and I want to get

3   this money back to me." After listening to his explanation, the man threatened to come to

4   Mr. Gonzalez's workplace and physically hurt him. Mr. Gonzalez testified that the man

5   sounded very upset and that Mr. Gonzalez took the threat seriously. Mr. Gonzalez hung up

6   the phone. Thereafter, he reported the threat to two of his supervisors at work.

7       Mrs. Ortiz also testified against her husband.[2] Her testimony differed slightly from

8   Mr. Gonzalez's testimony. She testified that she married Petitioner in December 2000 and

9   that they had one child together. At the time of the incident, Mrs. Ortiz was three months

10  pregnant with their second child and feeling ill due to her pregnancy. She also testified that

11  she was depressed because of a prior miscarriage and because her grandfather was ill.

12      On February 9, 2001, Mrs. Ortiz testified that she received a telephone message from

13  Gonzalez after returning home for a doctor's appointment. Before calling him back, Mrs.

14  Ortiz told her husband that Mr. Gonzalez wanted to talk to her about money she had

15  borrowed from him for wedding expenses. At this point, Petitioner became angry at his wife

16  for borrowing money without telling him.

17      Mrs. Ortiz testified that she called Mr. Gonzalez back to let him know she intended to

18  return the money, but could not do so immediately because her grandfather was in the

19  hospital. According to Mrs. Ortiz, she told Mr. Gonzalez that she would ask her parents for

20  the money and call him back later. However, after she hung up the phone, Mr. Gonzalez

21  called back immediately. Mrs. Ortiz claims that it was only at this point that Petitioner got

22

23

24  [2]    The morning before the trial started, the Court addressed the issue of whether Mrs.

25  Ortiz was going to testify, and if so, what immunity she would be offered. Joshua Lynn, the
    district attorney prosecuting the case; Tom Stanley, counsel for Petitioner; and Dan Murphy,

26  counsel for Mrs. Ortiz, were present. During the hearing, Mr. Murphy represented that his
    client intended to invoke her Fifth Amendment right not to testify. Mr. Lynn responded that,

27  if Mrs. Ortiz "took the Fifth," immunity would be immediately offered to induce her to

28  testify. Mr. Murphy then stated, "well, alright then, she will testify and we don't have to put
    any of this on the record."

1  on the telephone. She testified that Petitioner never threatened Mr. Gonzalez but only asked

2  him to come over to the house and show him the returned checks.

3      After the call with Mr. Gonzalez ended, Mrs. Ortiz testified that Petitioner began

4  arguing with her. She stated that he began questioning her about the money and accused her

5  of having a sexual relationship with Mr. Gonzalez. At some point during the argument,

6  Petitioner punched Mrs. Ortiz in the face. She also testified that he kicked her in the knee.

7      The following day, February 10, 2001, Mrs. Ortiz went to the Santa Barbara Police

8  Department with her father, mother, and sister. She was interviewed by Officer James Fuller

9  ("Officer Fuller"). Mrs. Ortiz recalled telling Officer Fuller that Petitioner had punched and

10  kicked her. Officer Fuller testified that on the day she came to the station, Mrs. Ortiz

11  appeared to have severe bruising around her mouth area and her left eye, and that her knee

12  appeared swollen and discolored. At trial, Mrs. Ortiz identified photographs taken of her at

13  the police station showing bruising on her chin, face and knee. The photographs also

14  showed some damage to Mrs. Ortiz's lips and bruising to her left eye. However, she could

15  not recall whether these injuries were caused by Petitioner. Mrs. Ortiz got an emergency

16  restraining order against Petitioner that covered her, her parents, and her sister. Officer

17  Fuller testified that the restraining order covered all of Mrs. Ortiz's family because Mrs.

18  Ortiz believed Petitioner had threatened them, telling her that "if she ever left him . . . he

19  would hurt her family."

20      Approximately three weeks prior to trial, Jim Nalls ("Investigator Nalls"), an

21  investigator with the District Attorney's Office, called Mrs. Ortiz at home. Mrs. Ortiz

22  testified that she received the call but that she did not want to speak to the investigator. She

23  told him that she wanted to "live a normal life with [her] husband and [her] daughter." The

24  telephone conversation was recorded and reflected her reluctance to cooperate with the

25  District Attorney's Office. At one point, Mrs. Ortiz indicated that she may have received

26  some of her injuries as a result of falling into a rocking chair, and not from Petitioner.

27  However, this recording was never introduced at trial. On direct examination Mrs. Ortiz

28

-4-

1   testified that she did not recall ever telling Investigator Nalls that she had fallen into a

2   rocking chair.

3          B.      Limitation on Cross-Examination

4          During Mrs. Ortiz's cross-examination, the following exchange occurred between

5   Mrs. Ortiz and Petitioner's counsel, Mr. Stanley:

6              Mr. Stanley:  You were asked right at the end of your testimony
               previously about talking to Investigator Nalls I think three weeks ago,
7              correct?

8              Mrs. Ortiz:  Yes, that is correct.

9              Mr. Stanley:  And he interviewed—he wanted to speak to you about
               what happened, correct?
10

11             Mrs. Ortiz:  Yes, that is correct.

12             Mr. Stanley:  And even though you didn't really want to speak with
               him, you did speak with him for awhile?

13             Mrs. Ortiz:  Yes, I did mention we were going to go out to dinner with
               my sister-in-law and her family and he continued to question me, and I
14             mention [sic] to him that I didn't want to talk about it.

15             Mr. Stanley:  Did you have some concerns in talking about it?  Had you
               perceived any sort of danger to your situation?
16

17             Mrs. Ortiz:  Yes.  They've actually—they've threatened me that if I
               didn't testify.
18

19             Mr. Lynn (prosecutor):  Objection.  Move to strike.  Counsel—

20             Mr. Stanley:  Goes to her state of mind, your Honor.  I think it's entitled
               to be presented.

21             The Court:  Sustained.

22             Mr. Stanley:  What did you tell Mr. Nalls about why you weren't
               speaking to him.
23

24             Mr. Lynn:  Same objection, your Honor.  Unless it calls for a separate
               answer.

25             Mr. Stanley:  Your Honor, I would like to go sidebar.  I do want to
               make this comment.
26

27             The Court:  The question is what did she say to Mr. Nalls.  I'll permit it.
               What did you say to him?
28

-5-

1    Mrs. Ortiz: What did I say to him that day that he went to the house?

2    Mr. Stanley:  About why you didn't want to talk to him.

3    Mrs. Ortiz:  Because they threatened me that if I didn't—

4    Mr. Lynn: Same objection.

5    The Court:  I'm going to sustain the objection if that's the issue.

6    Mr. Stanley:  I would like to make my point at sidebar with the reporter.

7    At sidebar, Stanley proffered that the witness was going to testify that she perceived a

8    threat from the District Attorney's office, coming from Mr. Lynn, that if she testified in a

9    manner different from her previous statement she would be prosecuted for perjury and could

10   lose custody of her children.  Stanley stated:

11          [B]ack in the jury room with Mr. Murphy, myself and Ms. Ortiz,
             I heard her say that Mr. Ortiz did not strike her, that she was
12          afraid she was going to be prosecuted for perjury if she testified
             to that effect here, and that was one of the things that she was
13          weighing in how to testify, whether to continue with the first
14          report or not.

15   Stanley argued that the Petitioner was entitled to present this evidence, which was directly

16   relevant to the witness's testimony; "[o]therwise, Mr. Ortiz is being denied his right of

17   cross-examination and confrontation and his right to present all relevant evidence to the trier

18   of fact."[3]

19

20   _____

21   [3]    Prior to trial, Petitioner moved to disqualify the District Attorney's Office on the
      ground that a conflict of interest existed that might impair the prosecutor's ability to perform
22   his duties in an impartial manner.  In support of his Motion, Petitioner provided declarations
      from Mrs. Ortiz and her father Martin Huerta ("Mr. Huerta").  In his declaration, Mr. Huerta
23   stated that his sister-in-law, Sonia Huerta, worked in the District Attorneys office.  She
      spoke to Mr. Lynn prior to Petitioner's preliminary hearing.  According to Mr. Huerta,
24   "Sonia told me that Mr. Lynn said that if Miriam did not tell the truth at the preliminary
      hearing, she could be sent to jail.  He said Miriam needed to think about that because she
25   had a baby and the baby was going to grow up without both parents."  Mr. Lynn admitted
      that he had spoken to Sonia Huerta prior to the preliminary hearing, but stated, "I informed
26   Sonia Huerta that the victim certainly did not have to speak with our office or anyone else
      but that she was under subpoena for the preliminary hearing and she needed to appear and
27   testify truthfully if called."  The trial court denied the Motion to Disqualify the District
28   Attorney's Office.

1    The Court decided to convene a meeting between the Mr. Lynn, Mr. Murphy, and Mr.

2  Stanley in chambers at this point to investigate further into the facts behind the threat

3  allegations. In chambers, Mr. Stanley reiterated his story that, around 2:00 p.m., just before

4  trial commenced, Mrs. Ortiz represented to Mr. Stanley and her attorney, Mr. Murphy, that

5  Petitioner had not hit her but that she was afraid that if she testified to that effect at trial, she

6  would be prosecuted for perjury. Mr. Stanley believed that Mrs. Ortiz felt pressure from

7  both her own attorney and the district attorney to testify.

8    Mr. Murphy remembered the incident differently. According to Mr. Murphy, his

9  client was "very clear about what her testimony was at 11:30 [a.m.] when [he] left her."

10  However, after going to lunch with Mr. Ortiz that afternoon, Mrs. Ortiz returned around

11  1:30 p.m. and voiced some concerns. She said, "How is anyone going to know what really

12  happened, what's really the truth, when no one was there? It was just me and him." Mr.

13  Murphy maintained, however, that at no time during the conversation did Mrs. Ortiz deviate

14  from her initial story that Petitioner hit her. Mr. Murphy objected to the line of questioning

15  on the grounds that it implicated the attorney-client privilege and that there was no

16  foundation to suggest that he ever pressured his client to testify, much less threatened her.

17  Mr. Murphy also voiced his opinion that, though Mrs. Ortiz was clearly conflicted and

18  wanted to help her husband, she had told the truth on the witness stand and "attempted to not

19  perjure herself."

20    Mr. Lynn also reiterated his objection to the line of questioning, stating:

21        At the preliminary hearing when I called [Mrs. Ortiz] to testify,
          Mr. Stanley objected on the grounds that she said I had
22        threatened to take her kid and all of these other things if she
          perjured herself in that hearing. This is months and months ago
23        this issue came up. . . . In the interim time this issue has been
          hanging out there for months and months and months and there's
24        been no proof of this at all. What we now have is a bald-faced
          allegation that I cannot refute unless I testify personally in my
25        own case, which is very difficult to do. And the basis, the so-
          called good faith basis for it is zero. There's no foundation for
26        it.

27

28

-7-

1    The trial court agreed that the issue of whether Mrs. Ortiz was threatened by any of
2    the attorneys would probably require all three attorneys—Mr. Lynn, Mr. Murphy, and Mr.
3    Stanley—to testify, and that such testimony could create complex dilemmas regarding
4    confidentiality and conflicts of interest. The Court sustained Mr. Lynn's objection to that
5    portion of the proposed cross-examination. However, the Court specifically did not preclude
6    questioning about the alternative story that Mrs. Ortiz told Investigator Nalls, that at least
7    some of her injuries were caused by falling into a rocking chair rather than by her altercation
8    with Petitioner.

9           C.    Additional Evidence Presented At Trial

10          After the jury reconvened, Mr. Stanley proceeded with his cross-examination.
11   Though he asked Mrs. Ortiz several times whether her trial testimony was accurate, he never
12   asked Mrs. Ortiz anything about the specifics of the statement she provided to Investigator
13   Nalls. Mrs. Ortiz testified that, though she could not recall exactly what happened during
14   the incident, everything she said on the stand was truthful.

15          Following the presentation of evidence, pursuant to a stipulation by the parties, the
16   trial court read the following statement to the jury: "Within four to ten years immediately
17   prior to the crime alleged in this case [Petitioner] was convicted of felony spousal abuse."
18   Petitioner did not testify.

19          In closing argument, Petitioner's counsel conceded that Petitioner had assaulted Mrs.
20   Ortiz, but argued that the jury should find Petitioner guilty of only misdemeanor spousal
21   battery.

22          D.    Post-Trial Rulings

23          The jury found Petitioner guilty of felony spousal abuse. Petitioner then filed a
24   motion for a new trial based on the trial court's curtailment of Mrs. Ortiz's cross-
25   examination. The trial court denied the motion. During the sentencing hearing, the issue of
26   Petitioner's cross-examination rights was raised again. The trial court declined to consider
27   the cross-examination issue in determining an appropriate sentence. Testimony was heard
28   from Mrs. Ortiz and Petitioner's other family members. The trial court declined to reduce

1  Petitioner's conviction to a misdemeanor or strike any of his prior felonies. The court

2  adopted the recommendation of the Probation Department and imposed a sentence of

3  twenty-six years to life, based on the base term of twenty-five years to life due to the prior

4  strike offenses and a one year enhancement pursuant to Cal. Penal Code § 667.5(b).

5      On appeal, the California Court of Appeal determined that "the trial court erred by

6  refusing to allow defense counsel to cross-examine Miriam as to whether her testimony was

7  influenced by any threat or implied threats of prosecution." However, the Court of Appeal

8  determined that the error was harmless. The Court of Appeal affirmed the conviction and

9  sentence. The California Supreme Court denied Petitioner's petition for review without a

10  substantive opinion.

11  II.    Standard of Review

12      Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

13  federal court may grant a writ of habeas corpus to a state prisoner only if the state court's

14  decision is "contrary to, or involves an unreasonable application of, clearly established

15  Federal law, as determined by the Supreme Court of the United States," or is "based on an

16  unreasonable determination of the facts in light of the evidence presented" to the state court.

17  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 385–86, 120 S. Ct. 1495, 1509, 146

18  L. Ed. 2d 389 (2000) ("[T]he text [of the AEDPA] is fairly read simply as a command that a

19  federal court not issue the habeas writ unless the state court was wrong as a matter of law or

20  unreasonable in its application of law in a given case. . . . [I]t seems clear that Congress

21  intended federal judges to attend with the utmost care to state-court decisions, including all

22  of the reasons supporting their decisions, before concluding that those proceedings were

23  infected by constitutional error sufficiently serious to warrant the issuance of the writ.").

24      A state court's decision is "contrary to" federal law if the state court "'failed to apply

25  the correct controlling authority from the Supreme Court,'" Benn v. Lambert, 283 F.3d

26  1040, 1051 (9th Cir. 2002) (quoting Shackleford v. Hubbard, 234 F.3d 1072, 1077 (9th Cir.

27

28

2000)),[4] and "constitutes an 'unreasonable application' of federal law 'if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case.'" Id. (quoting Williams, 529 U.S. at 407, 120 S. Ct. at 1520) (alteration in original).[5] "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." Wiggins v. Smith, 539 U.S. 510, 520, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003). "The state court's application must have been 'objectively unreasonable.'"[6] Id. at 520–21, 120 S. Ct. at 2535; see also Lockyer v. Andrade, 538 U.S. 63, 75–76, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003) ("'Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Rather, that application must be objectively unreasonable.") (quoting Williams, 529 U.S. at 411, 120 S.

---

[4] See also Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2003) ("A state court decision is 'contrary to' our clearly established precedents if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' Avoiding these pitfalls does not require citation of our cases—indeed, it does even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (quoting Williams, 529 U.S. at 405–06, 120 S. Ct. at 1519–20) (emphasis in original).

[5] While granting a writ of habeas corpus is only appropriate if adjudication of the claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court law, Ninth Circuit and other cases "'may be persuasive authority for purposes of determining whether a particular state court decision is an "unreasonable application" of Supreme Court law and may also help us determine what law is "clearly established."'" Fowler v. Sacramento County Sheriff's Dept., 421 F.3d 1027, 1034 (9th Cir. 2005) (quoting Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000)).

[6] "When determining whether a decision is either 'contrary to' or an 'unreasonable application' of the AEDPA, the habeas court must examine the last reasoned decision by the state court." Kennedy v. Lockyer, 379 F.3d 1041, 1052 (9th Cir. 2004). Because the California Supreme Court denied Petitioner's claims without comment, the Court will instead consider the reasoned opinion of the California Court of Appeal denying Petitioner's appeal. See id.; see also Brodit v. Cambra, 350 F.3d 985, 987 (9th Cir. 2003).

1   Ct. at 1499). Thus, under the AEDPA a federal court may not grant habeas relief unless the
2   relevant state court's application is objectively unreasonable, even if that federal court
3   would hold that a constitutional error occurred. See Brown v. Payton, 544 U.S. 133, 148,
4   125 S. Ct. 1432, 1442, 161 L. Ed. 2d 334 (2005) (Breyer, J., concurring) (explaining that
5   "[w]ere [he] a California state judge, [he] would likely hold that [the defendant's] penalty-
6   phase proceeding violated the Eighth Amendment," but finding that the AEDPA compels
7   deference to the reasonable conclusions of state court judges).

8   III.    Analysis

9           In this case, the Court of Appeal found that the trial court improperly limited Mrs.
10  Ortiz's cross-examination because California law provides that "an explanation of the
11  witness's fear of testifying is relevant to the jury's assessment of credibility." Appellate
12  Opinion, p. 7 (citing Cal. Evid. Code § 780; People v. Feagin, 34 Cal. App. 4th 1427, 1433,
13  40 Cal. Rptr. 2d 918, 920 (Ct. App. 1995)).

14          The Court of Appeal, however, appears to have concluded that this error did not
15  reach constitutional magnitude. While the Court of Appeal never explicitly stated that
16  Petitioner's federal constitutional rights were not violated, the opinion cites to People v.
17  Cudjo, which stands for the proposition that state law evidentiary errors generally do not
18  raise constitutional concerns and should be weighed based on the state court's test for
19  harmless error. See 6 Cal. 4th 585, 611–12, 25 Cal. Rptr. 2d 390 (1993) ("We reiterate that
20  in general under California law, the credibility of individual witnesses 'is properly the
21  province of the jury.' Nonetheless, absent clearer guidance from above, we will not lightly
22  assume that a trial court invites federal constitutional scrutiny each and every time it decides,
23  on the basis of the particular circumstances, to exclude a defense witness as unworthy of
24  credit. . . . We conclude that the Watson [state law] standard of prejudice applies to the trial
25  court's mistake.") (quoting People v. Hall, 41 Cal.3d 826, 834, 226 Cal. Rptr. 112, 117
26  (1986)). Accordingly, because the Court of Appeal implicitly found no constitutional error,
27  the Court of Appeal applied the state law harmless error standard rather than the stricter
28

1  standard for constitutional error under <u>Chapman v. California</u>.[7/]  <u>Cf</u>. <u>Chapman</u>, 386 U.S. at

2  21, 87 S. Ct. at 826 ("The application of a state harmless-error rule is, of course, a state

3  question where it involves only errors of state procedure or state law.")

4         The Court of Appeal's failure to identify expressly the correct standard of review

5  does not necessarily render its decision contrary to law under the AEDPA.  <u>Fowler</u>, 421 F.3d

6  at 1035 ("[T]he mere failure to identify expressly the correct legal standard does not render

7  the state court's decision 'contrary to' clearly established federal law as determined by the

8  Supreme Court so long as the state court's reasoning and result are not 'contrary to' that

9  precedent." (citing <u>Early</u>,, 537 U.S. at 8, 123 S. Ct. at 365); <u>see also</u> <u>Bains v. Cambra</u>, 204

10 F.3d 964, 971 (9th Cir. 2000) (finding that the California Court of Appeal's application of

11 the state harmless error standard supported the conclusion that it "impliedly found that

12 admission of the hearsay evidence . . . was not an error of constitutional magnitude").

13        The Court must examine the Court of Appeals' decision under the highly deferential

14 standard required by AEDPA.  <u>See</u> <u>Wiggins</u>, 539 U.S. at 520–21, 120 S. Ct. at 2535.  Using

15 that standard of review, the Court cannot conclude that it was contrary to or an objectively

16 unreasonable application of federal law for the Court of Appeal to find that the trial court's

17 error did not reach constitutional magnitude and apply the state harmless error test as a

18 result.

19        The Sixth Amendment guarantees criminal defendants the right to cross-examine

20 witnesses against them.[8/]  U.S. Const. amend. VI; <u>Fowler</u>, 421 F.3d at 1035.  The right to

21 cross-examination, however, is not absolute.  <u>Michigan v. Lucas</u>, 500 U.S. 145, 149, 111 S.

22 Ct. 1743, 1746, 114 L. Ed. 2d 205 (1991) ("'[T]he right to present relevant testimony is not

23 without limitation.  The right "may in appropriate cases, bow to accommodate other

24

25 [7/]    In <u>Chapman v. California</u>, the Supreme Court held constitutional errors must be
   "harmless beyond a reasonable doubt" to be held harmless.  386 U.S. 18, 24, 87 S. Ct. 824,
26 828, 17 L. Ed. 2d 705 (1967).

27 [8/]    This right is incorporated by the Fourteenth Amendment to apply to state
   prosecutions.  <u>Id</u>. (citing <u>Pointer v. Texas</u>, 380 U.S. 400, 403, 85 S. Ct. 1065, 1067, 13 L.
28 Ed. 2d 923 (1965)).

legitimate interests in the criminal trial process.""") (quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 55, 107 S. Ct. 2704, 2711, 97 L. Ed. 2d 37 (1987)); <u>Wood v. Alaska</u>, 957 F.2d 1544, 1552 (9th Cir. 1992) (upholding exclusion of relevant cross-examination on the ground that its probative value was outweighed by other legitimate judicial interests). Although the Supreme Court has "recognized that exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," it has also held that "[i]t does not follow, of course, that the Confrontation Clause of the Sixth Amendment  prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.  On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678–79, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986) (quotation omitted).[9/] "'[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.'" <u>Id.</u> (emphasis in original) (quoting <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20, 106 S. Ct. 292, 295, 88 L. Ed. 2d 15 (1985)).

As a general matter, a trial court's decision to exclude otherwise relevant evidence because its probative value is substantially outweighed by the potential for prejudice or undue waste of time does not implicate a defendant's federal constitutional rights unless the trial court's decision was unreasonable, arbitrary, or disproportionate to the purposes the restrictions were designed to serve. See <u>Fowler</u>, 421 F.3d at 1030, 1037 (holding that

---

[9/]     See also Cal. Evid. Code § 352 ("The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."), Fed. R. Evid. 403 (permitting exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

1   restricting cross-examination does not violate the Sixth Amendment unless the restriction is

2   "unreasonable, arbitrary or disproportionate" (quoting Van Arsdall, 475 U.S. at 679, 106 S.

3   Ct. at 1435, and Lucas, 500 U.S. at 151, 111 S. Ct. at 1747)). Thus, such a restriction does

4   not implicate the Sixth Amendment unless it constitutes an abuse of discretion. See United

5   States v. Sua, 307 F.3d 1150, 1153 (9th Cir. 2002) ("[T]he Confrontation Clause 'does not

6   guarantee unbounded scope in cross-examination.'. . . [The defendant's] right to

7   confrontation was violated only if the district court abused its discretion in excluding

8   relevant evidence where other legitimate interests do not outweigh [the defendant's] interest

9   in presenting any evidence.") (quoting United States v. Lo, 231 F.3d 471, 482 (9th Cir.

10  2000)).[10]

11      With respect to limitations on bias evidence, there is no Confrontation Clause

12  violation unless the trial court erroneously prohibited appropriate cross-examination

13  designed to reveal a "prototypical form of bias" and the limitation deprived the jury of

14  evidence that may have created a "significantly different impression" of the witness's

15  credibility. See Van Arsdall, 475 U.S. at 680, 106 S. Ct. at 1436; Lo, 231 F.3d at 482

16  (holding that a trial court's ruling that "limits relevant testimony" only violates the

17  Confrontation Clause if it "prejudices the defendant and denies the jury sufficient

18  information to appraise the biases and motivations of the witness") (alterations and quotation

19  omitted); People v. Quartermain, 16 Cal.4th 600, 623–24, 66 Cal. Rtpr. 2d 609, 623 (1997)

20  ("[N]otwithstanding the Confrontation Clause, a trial court may restrict cross-examination of

21  an adverse witness on the grounds stated in Evidence Code section 352. A trial court's

22  limitation on cross-examination pertaining to the credibility of a witness does not violate the

23  confrontation clause unless a reasonable jury might have received a significantly different

24  _____

25  [10]     Factors that a court considers in determining whether an exclusion of evidence
    "reaches constitutional proportions" include: "'(1) the probative value of the excluded
26  evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the
    trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5)
27  whether it constitutes a major part of the attempted defense.'" Whelchel v. Washington, 232
    F.3d 1197, 1211 (9th Cir. 2000) (quoting Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir.
28  1990)).

1  impression of the witness's credibility had the excluded cross-examination been permitted.")
2  (citation omitted).

3       The trial court concluded that admitting evidence of the alleged threats would be both
4  highly prejudicial and an undue waste of time. Permitting Petitioner to accuse Mr. Lynn, the
5  district attorney in charge of trying the case, of threatening a witness could have been
6  prejudicial. See United States v. Quinones, 511 F.3d 289, 309–10 (2d Cir. 2007) (finding
7  threat evidence subject to the same Rule 403 balancing as other evidence); United States v.
8  Baker, 432 F.3d 1189, 1220 (11th Cir. 2005) (acknowledging the great potential prejudice
9  from threat evidence); United States v. Thomas, 86 F.3d 647, 653 (7th Cir. 1996) (stating
10 that Rule 403 applies to threat evidence). It would have shifted the focus of the case away
11 from the issue of Petitioner's guilt or innocence to the issue of the propriety of the district
12 attorney's actions. Cf. United States v. Rios, 611 F.2d 1335, 1341–43 (10th Cir. 1979)
13 (holding that the prosecutor's unsupported allegations of improper behavior by defense
14 counsel and his investigator constituted prejudicial error).

15      It also would have taken significant time and resources to fully develop the issue.
16 The parties' recollection of the events surrounding the alleged threats were widely divergent.
17 In all likelihood, admitting the threat evidence would have required the prosecutor trying the
18 case, Petitioner's attorney, and Mrs. Ortiz's counsel to all take the stand. This not only
19 would have required substantial testimony on an arguably ancillary issue, it also would have
20 raised ethical and practical dilemmas for all parties involved. Cf. People v. Jennings, 53
21 Cal.3d 334, 372, 279 Cal. Rptr. 780, 803–04 (1991) (holding that the trial court's decision to
22 exclude collateral impeachment evidence that would require extensive testimony from
23 numerous witnesses did not implicate the defendant's Confrontation Clause rights). Indeed,
24 Mrs. Ortiz's own counsel objected to Petitioner's proposed line of questioning on the
25 grounds that it lacked foundation and would require extensive, burdensome investigation
26 into a collateral matter.

27      Additionally, the foundational support for the threat evidence was weak. Cf.
28 Whelchel, 232 F.3d at 1211 (finding that the probative value of unreliable evidence is

1  minimal). There was no evidence that Mr. Lynn had any contact with Mrs. Huerta except

2  prior to the preliminary hearing when he told her that Mrs. Ortiz was legally obligated to

3  testify truthfully, and that failure to do so could result in criminal perjury charges. This

4  occurred weeks before trial, and was the basis for the rejected Motion to Disqualify. In the

5  interim, efforts were undertaken to cure any prejudice that this statement may have had on

6  Mrs. Ortiz's testimony. She hired her own counsel to advise her on her potential criminal

7  exposure and she was offered testimonial immunity. The trial court found that "she was

8  well advised, and knew what her options were."[11/] Thus, the trial court ultimately concluded

9  that permitting inquiry into the alleged threats would be tantamount to "suborning perjury."

10  See Appellate Decision ("The court felt that it was clear that if counsel had made the

11  inquiries the court had precluded, counsel would have been suborning perjury."); see also

12  United States v. Grayson, 438 U.S. 41, 54, 98 S. Ct. 2610, 2617–18, 57 L. Ed. 2d 582 (1978)

13  (holding that the "unquestioned constitutionality of perjury statutes" demonstrates that a

14  defendant's constitutional rights only extend to truthful evidence and "[t]here is no protected

15  right to commit perjury"); Greene v. Lambert, 288 F.3d 1081, 1093 (9th Cir. 2002) (holding

16  that, while "a defendant or victim" need not "be allowed to present any defense, no matter

17

---

18  [11/]     Furthermore, it is questionable whether the warnings regarding perjury that Mrs.
19  Ortiz received can be characterized fairly as threats. From the beginning, it was apparent
     that Mrs. Ortiz was reluctant to testify against her husband and there was a strong possibility
20  that she would change her story to protect him, as evidenced by her statement to Investigator
     Nalls that she received her injuries from falling into a chair. Mr. Lynn's statement to Mrs.
21  Huerta that Mrs. Ortiz was obligated to testify truthfully may have been prudent under the
     circumstances. Compare United States v. Vavages, 151 F.3d 1185 (9th Cir. 1998)
22  ("[P]erjury warnings are not improper per se and . . . 'the Sixth Amendment is not
     implicated every time a prosecutor or trial court offers advice regarding the penalties of
23  perjury. Indeed, there are circumstances when warnings about the possibility and
     consequences of a perjury charge are warranted—even prudent.'") (quoting United States v.
24  Davis, 974 F.2d 182, 187 (D.C. Cir. 1992)) (internal citations omitted), with Webb v. Texas,
25  409 U.S. 95, 98, 93 S. Ct. 351, 353, 34 L. Ed. 2d 330 (1972) (holding that the judge's
     rigorous admonitions against perjury drove petitioner's sole witness from the stand and
26  deprived him of a fair trial). The Court is even less willing to find that Mr. Murphy
27  committed any error by warning his client about the potential repercussions of committing
28  perjury. If he was worried that his client intended to lie to the jury, such warnings were
     proper.

1  how bizarre or far fetched," an overly broad limitation on evidence based on reliability

2  concerns may violate the defendant's Sixth Amendment rights) (emphasis in original).

3      Moreover, while Mr. Lynn's statements to Mrs. Huerta may have some relevance to

4  Mrs. Ortiz's motivation for testifying, Mrs. Ortiz had already been impeached on several

5  other grounds. She admitted that her recollection of the incident was compromised by her

6  depressed emotional state, and her reluctance to testify was apparent. The trial court

7  explicitly ruled that Petitioner could ask Mrs. Ortiz questions about the alternative story she

8  told Investigator Nalls and any other inconsistent statements she may have made. Cf. United

9  States v. Adamson, 291 F.3d 606, 612 (9th Cir. 2002) ("When exploring the credibility of a

10  government witness who testifies against a criminal defendant at trial, it is axiomatic that the

11  defendant may employ the witness's prior inconsistent statements in order to impeach the

12  credibility of the witness."). Petitioner's counsel was permitted to ask several times whether

13  she lied about Petitioner having hit her. The trial court only prohibited Petitioner from

14  eliciting testimony regarding the alleged threats. Thus, unlike in the seminal case of

15  Delaware v. Van Arsdall, the trial court did not deprive Petitioner entirely of his right to

16  explore his wife's potential bias. See 475 U.S. at 678, 106 S. Ct. at 1435.[12/]

17      The task of this Court is not to determine whether, in its judgment, Petitioner's Sixth

18  Amendment rights were violated. Rather, its task is to determine whether the Court of

19  Appeals' decision was contrary to law or an unreasonable application of federal law under

20  AEDPA. Accordingly, the Court finds that the Court of Appeal's decision that the trial

21  court's restriction was not unreasonable, arbitrary, or disproportionate was neither contrary

22  to established Supreme Court law nor an unreasonable application of federal law. See

23  Lockyer, 538 U.S. at 65, 123 S. Ct. at 1169 (explaining that a state court's decision must be

24  "objectively unreasonable," which goes beyond even a commission of clear error); Fowler,

25  421 U.S. at 1038 ("Nor are there any Supreme Court cases that are materially

26

27  [12/]  In Van Arsdall, the trial court barred all cross-examination on the witness's deal with
    the prosecution wherein he agreed to testify against the defendant if the prosecution agreed
28  to drop unrelated drunk-driving charges pending against the witness. 475 U.S. at 677, 106
    S. Ct. at 1434.

1   indistinguishable from the situation here in which the Supreme Court held contrary to the

2   trial court. Thus, the trial court's ruling was not 'contrary to' clearly established federal

3   law.").

4   III.   Conclusion

5       For all the foregoing reasons, the Court denies Adilao Juan Ortiz's Petition for Writ

6   of Habeas Corpus by a Person in State Custody.

7       IT IS SO ORDERED.

8   DATED:  July 20, 2011

9                                                       Percy Anderson
                                                        UNITED STATES DISTRICT JUDGE